**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LAVVAN, INC.,

                Plaintiff,

      v.

AMYRIS, INC.,

                Defendant.

No. 20-cv-07386 (JPO)

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO COMPEL ARBITRATION
OR, IN THE ALTERNATIVE, TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .............................................................................................................. 2

ARGUMENT .................................................................................................................... 4

I.    This Action Was Properly Filed in this Court and Is Not Subject to Arbitration .............. 4

    A.    The RCL Agreement Is Clear: Lavvan's IP Claims May Not Be
        Submitted to Arbitration ............................................................................... 5

    B.    Whether Lavvan's IP Claims Should Be Arbitrated Is a Question for this
        Court, Not an Arbitrator .............................................................................. 7

II.   Lavvan States Proper Patent Infringement and Trade Secret Claims Against Amyris ..... 10

    A.    Lavvan States a Claim for Amyris's Patent Infringement ................................... 10

    B.    Lavvan States a Claim for Amyris's Misappropriation of Trade Secrets ............ 16

    (i)    Lavvan Alleges the Existence of Protectable Trade Secrets ............................... 16

    (ii)   Lavvan Alleges Misappropriation by Amyris ..................................................... 20

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Ad Lightning Inc. v. Clean.io, Inc.*,
    2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020) (Oetken, J.) ...................................... 19

*Anchor Sales & Mktg. v. Richloom Fabrics Grp.*,
    2016 WL 4224069 (S.D.N.Y. Aug. 9, 2016)........................................................... 10

*AUA Private Equity Partners, LLC v. Soto*,
    2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018)............................................................ 21

*Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*,
    2019 WL 5694256 (E.D.N.Y. July 22, 2019) ......................................................... 20

*Contec Corp. v. Remote Sol., Co.*,
    398 F.3d 205 (2d Cir. 2005)...................................................................................... 9

*Corning Inc. v. Shenzhen Xinhao Photoelectric Tech. Co.*,
    --- F. Supp. 3d ---, 2020 WL 4690285 (W.D.N.Y. Aug. 13, 2020)........................ 14

*Energy Intelligence Grp., Inc. v. Jefferies, LLC*,
    101 F. Supp. 3d 332 (S.D.N.Y. 2015) .................................................................... 14

*ExpertConnect, L.L.C. v. Fowler*,
    2019 WL 3004161 (S.D.N.Y. July 10, 2019) ................................................... 19, 21

*Genometrica Research Inc. v. Gorbovitski*,
    2013 WL 394892 (E.D.N.Y. Jan. 31, 2013) .............................................................. 7

*Grecia v. McDonald's Corp.*,
    724 F. App'x 942 (Fed. Cir. 2018) .......................................................................... 15

*Hochroth v. William Penn Life Ins. Co.*,
    2003 WL 22990105 (S.D.N.Y. Dec. 19, 2003) ......................................................... 7

*Horzion Comics Prods., Inc. v. Marvel Entm't, LLC*,
    246 F. Supp. 3d 937 (S.D.N.Y. 2017) .................................................................... 10

*Iacovacci v. Brevet Holdings, LLC*,
    437 F. Supp. 3d 367 (S.D.N.Y. 2020) ............................................................... 17, 19

*Intellectual Ventures I LLC v. Motorola Mobility LLC*,
    870 F.3d 1320 (Fed. Cir. 2017)............................................................................... 15

*Iron Gate Sec., Inc. v. Lowe's Cos.*,
    2016 WL 1070853 (S.D.N.Y. Mar. 16, 2016). ............................................. 10, 11, 15

*Island Intellectual Prop., LLC v. StoneCastle Asset Mgmt. LLC,*
   2020 WL 2793000 (S.D.N.Y. May 29, 2020) ................................................ 19, 20

*Ji Dong Cheng v. HSBC Bank USA, N.A.,*
   2020 WL 3165214 (E.D.N.Y. June 15, 2020) .......................................................... 6

*Kraus USA, Inc. v. Magarik,*
   2020 WL 2415670 (S.D.N.Y. May 12, 2020) ........................................................ 19

*L.M. Sessler Excavating & Wrecking, Inc. v. Bette & Cring, LLC,*
   2017 WL 4652709 (W.D.N.Y. Oct. 17, 2017) ...................................................... 13

*Lawrence v. NYC Med. Practice, P.C.,*
   2019 WL 4194576 (S.D.N.Y. Sept. 3, 2019) ........................................................ 20

*Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC,*
   23 F. Supp. 3d 344 (S.D.N.Y. 2014) ................................................................... 13

*LivePerson, Inc. v. 24/7 Customer, Inc.,*
   83 F. Supp. 3d 501 (S.D.N.Y. 2015) ................................................................... 18

*Macronix Int'l Co., Ltd. v. Spansion Inc.,*
   4 F. Supp. 3d 797 (E.D. Va. 2014) ...................................................................... 13

*McRO, Inc. v. Namco Bandai Games Am., Inc.,*
   23 F. Supp. 3d 1113 (C.D. Cal. 2013) ................................................................. 14

*Medidata Sols., Inc., v. Veeva Sys. Inc.,*
   2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ........................................ 17, 19, 20

*Microsoft Corp. v. Samsung Elecs. Co.,*
   60 F. Supp. 3d 525 (S.D.N.Y. 2014) ................................................................. 8, 9

*N. Star Innovations, Inc. v. Micron Tech., Inc.,*
   2017 WL 5501489 (D. Del. Nov. 16, 2017) ........................................................ 12

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC,*
   770 F.3d 1010 (2d Cir. 2014) ............................................................................. 10

*Principia Partners LLC v. Swap Fin. Grp.,*
   2019 WL 4688711 (S.D.N.Y. Sept. 26, 2019) .............................................. 20, 21

*Prowire LLC v. Apple, Inc.,*
   2017 WL 3444689 (D. Del. Aug. 9, 2017) ......................................................... 14

*Regeneron Pharms. v. Merus B.V.,*
   2014 WL 2795461 (S.D.N.Y. June 19, 2014) .............................................. 11, 14

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
   322 F.3d 115 (2d Cir. 2003) ........................................................................... 8

*Spin Master, Ltd. v. E. Mishan & Sons, Inc.*,
   2019 WL 6681563 (S.D.N.Y. Dec. 9. 2019) ............................................... 7

*Sportvision, Inc. v. MLB Advanced Media, LP*,
   2020 WL 1957450 (S.D.N.Y. Apr. 23, 2020) ............................................. 5

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*,
   2016 WL 5338550 (S.D.N.Y. Sept. 23, 2016) ......................................... 19

*Textile Prods., Inc. v. Mead Corp.*,
   134 F.3d 1481 (Fed. Cir. 1998) ................................................................. 22

*Trahan v. Lazar*,
   457 F. Supp. 3d 323 (S.D.N.Y. 2020) ...................................................... 21

*VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*,
   717 F.3d 322 (2d Cir. 2013) ....................................................................... 9

## Other Authorities

18 U.S.C. § 1839 .............................................................................................. 21, 22

28 U.S.C. § 1836 .............................................................................................. 16, 22

David Q. Quinto et al., *Trade Secrets: Law and Practice* § 2.05 (2019) ...................... 21

## PRELIMINARY STATEMENT

In moving to compel arbitration, Amyris contends (at 1) that the "definitive proof" in support of its position that the claims pending in this Court need to be sent to arbitration is that ███████████████████████████████████████████ That reasoning is badly flawed. Amyris's reductive argument ignores the plain terms of the applicable RCL Agreement ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████

The contract expressly provides that the parties will arbitrate certain disputes arising under the contract (hence the pending arbitration), but that all disputes "with respect to the scope, ownership, validity, enforceability revocation or infringement" of intellectual property "*will not* be submitted to arbitration" and that the parties must bring IP disputes "*solely* in a court or other tribunal of competent jurisdiction." Section 7.2.1 (emphasis added). This is a "will not," mandatory exclusion of IP disputes from arbitration. Amyris's supposed "definitive proof" of ██ ███████████████████████████████████████████████ simply does not support Amyris's contention that these IP claims belong in arbitration. These IP claims belong in this Court.

Amyris's meta-argument, that any dispute about *whether* this claim must be arbitrated is itself a dispute that must be arbitrated, also fails. Amyris must show "clear and unmistakable evidence" that the parties agreed that an arbitrator would determine the question of arbitrability before the courts will impose such a procedure. Here, as noted, the contract is clear and unmistakable that Lavvan's IP claims "will not be submitted to arbitration" and must instead be litigated "solely in a court or other tribunal of competent jurisdiction." This provision is also fatal to Amyris's argument that adoption of the ICC rules somehow constitutes "clear and

unmistakable evidence" of the parties' intent to arbitrate arbitrability. Amyris does not remotely meet its burden to show the parties' "clear and unmistakable" intent for an arbitrator to decide the arbitrability of Lavvan's IP claims, and so the presumption of judicial determination of arbitrability stands.

Finally, Amyris's fallback request (at 2) that the Court dismiss Lavvan's claims as a matter of law on the grounds that Lavvan "has not pleaded intellectual property claims that could survive dismissal" is meritless. Amyris claims on the one hand that the claims "lack the legally required specificity" and on the other hand that "the asserted patents and trade secrets *belong to Amyris*." The second argument undermines the first: Amyris knows exactly what IP is subject to Lavvan's claims, and that IP is properly and specifically identified in the complaint. Amyris attempts to make much of the fact that the IP claims involve contractual rights that also ██████████████████████████████████████████████—but Amyris identifies no reason whatsoever why such overlap somehow warrants dismissal of Lavvan's IP claims. It does not. Amyris is wrongfully using IP it licensed exclusively to Lavvan. As part of their partnership to develop biosynthetic cannabinoids, Amyris assigned to Lavvan all the relevant IP rights to develop biosynthetic cannabinoids. That assignment is express and unambiguous: Lavvan holds *exclusive* IP rights—not even Amyris can develop cannabinoids (without Lavvan) using such IP. Yet Amyris has publicly announced that it is developing cannabinoids "at scale" on its own, without Lavvan. In doing so, Amyris is plainly infringing on Lavvan's exclusive IP rights.

## BACKGROUND

Led by one of the most influential, respected, and pioneering teams in the global cannabis industry, Lavvan is a biosynthetic cannabinoid technology, ingredient and product company. Compl. ¶¶ 26, 87–88. In 2018, Lavvan saw a multi-billion dollar opportunity to use its industry knowledge to manufacture valuable, high-quality biosynthetic cannabinoids on an industrial

scale. *Id.* ¶¶ 32–41. To do so, Lavvan approached and initiated a partnership with Amyris, a biosynthetic company specializing in industrial fermentation that owned hundreds of patents relating to those processes. *Id.* ¶¶ 43–46, 49. In March 2019, the parties entered the Research, Collaboration, and License Agreement (Compl. Ex. A, "RCL Agreement" or "RCLA"), which set forth the parties' respective roles: Amyris would perform R&D to create bacterial strains to produce biosynthetic cannabinoids, and Lavvan would commercialize those cannabinoids, paying Amyris milestone payments and part of the resulting profits in exchange for Amyris's R&D. *Id.* ¶ 57.

The partnership was fundamentally predicated on exclusivity: Lavvan paid millions of dollars to obtain an exclusive license, "even as to Amyris," to use the cannabinoid-relevant IP. *Id.* ¶ 62 (quoting RCLA § 5.6). Indeed, the exclusivity is highlighted by the structure of a new special-purpose entity (SPE) created to house the IP: the IP went first to the SPE before being licensed to Lavvan and, for limited, specific items contemplated in the RCL Agreement and not applicable here, back to Amyris. *Id.* Such IP includes patents and trade secrets. *Id.*; *see also* RCLA § 1.68. The RCL Agreement bars Amyris from even helping to produce cannabinoids outside of partnership (with limited, inapplicable exceptions).[1] Compl. ¶ 72 (citing RCLA § 11.2.13, which states: "During the term of this Agreement, Amyris will not produce, assist in the

---

[1] The first exception allows Amyris to use the licensed IP for the limited purpose of developing cannabinoids for its Biossance brand using only a single small fermenter, *after* Amyris hits specified commercial milestones or obtains Lavvan's consent, neither of which occurred here. *See* RCLA § 5.10; Compl. ¶¶ 71, 210. The second exception permits Amyris to use the licensed IP *four years after achieving certain commercial milestones*—which did not occur here—if, in the third year after those milestones were achieved, Amyris does not receive profit-share payments above a specified threshold. *See* RCLA § 6.1; Compl. ¶ 103. Amyris has referenced language in the RCL Agreement indicating that Lavvan's exclusive license does not extend to uses in the defined "Flavor & Fragrance Market," but that inapplicable language would not excuse Amyris's infringement because Amyris by its own admission "does not have rights to" the Flavor & Fragrance Market. Compl. ¶ 65.

production of, or license the Amyris IP to any Third Party for the production of any

Cannabinoid, or any or precursor compounds produced in the production of any Cannabinoid, if

such precursor compounds are intended for use in the production of any Cannabinoid.").

Dissatisfied with the terms of the agreement it struck, Amyris repeatedly demanded that

Lavvan change the terms of its agreement, and when Lavvan declined, Amyris flouted the

contract and violated Lavvan's exclusive rights to the IP covered by the parties' agreement.

Rather than honoring the parties' partnership, Amyris has announced that it is producing its own

biosynthetic cannabinoids without Lavvan and despite Lavvan's rights and demands to cease, all

in direct violation of Lavvan's IP rights and the RCL Agreement. *Id.* ¶¶ 206–14.[2]

## ARGUMENT

**I.   This Action Was Properly Filed in this Court and Is Not Subject to Arbitration**

Lavvan correctly brought its trade secret and patent claims in this Court, pursuant to the

RCL Agreement's express dispute resolution provisions.[3] Amyris's contention that the parties

---

[2] Amyris seeks to justify its blatant breaches by contending (at 3) that "it quickly became apparent to Amyris that Lavvan would not be upholding its end of the deal." To that end, Amyris improperly injects baseless factual contentions in its motion that are both outside the Complaint and inconsistent with the Complaint's allegations, which allegations the Court accepts as true on this motion. For example, Amyris improperly claims (at 4) that Lavvan has not provided adequate assurances of funding. Setting aside the fallacy of Amyris's factual contention, for purposes of this motion the Complaint makes clear that Lavvan "has never missed a milestone payment or suggested it would be unable to make one." Compl. ¶ 22. Moreover, Amyris never notified Lavvan of any breach as required under the RCL Agreement, further undermining this attempt to rewrite history. Amyris's motion fails with or without its added factual contentions, but such contentions are improper and should be disregarded.

[3] Amyris makes the unfounded claim (at 5 n.1) that Lavvan brought these claims in federal court for the purpose of some alleged collateral benefits. This claim rings hollow given the clear propriety of Lavvan's assertion of these claims in the forum expressly required by the RCL Agreement (as detailed in this brief). Further, Amyris's specific allegation that Lavvan purposefully ███████████████████████ has the facts backwards: As required under the Local Rules, Lavvan filed proposed redactions with the Court before filing the Complaint, and had in fact proposed redacting ████████████████. *See* Cyrulnik Decl., Ex. A (excerpt

must arbitrate these IP claims is completely without merit, and its attempt to forestall that inescapable conclusion by arguing that an arbitrator must decide arbitrability likewise fails.

### A.  The RCL Agreement Is Clear: Lavvan's IP Claims May Not Be Submitted to Arbitration

Amyris's motion to compel arbitration of Lavvan's IP claims is squarely refuted by Section 7.2.1 of the RCL Agreement, which expressly provides that a dispute regarding "the scope, ownership, validity, enforceability, revocation or infringement" of IP "will not be submitted to arbitration." Compl. Ex. A at 30. For IP claims, the contract expressly provides that the parties "may initiate litigation *solely* in a court or other tribunal of competent jurisdiction in the country of issuance, registration, application or other protection, as applicable, of the item of Intellectual Property that is the subject of the dispute." *Id.* (emphasis added). Thus, for IP claims, *arbitration simply is not an option*, "unless otherwise agreed by the Parties in writing." *Id.* Amyris's disregard for the contract's clear terms, though characteristic, is unsupportable.

To determine whether a claim is subject to a contractual arbitration clause, courts first classify the arbitration clause as either broad or narrow, and then determine whether the dispute at issue is within the purview of the clause or concerns a collateral issue connected to the main agreement covered by the clause. *See Sportvision, Inc. v. MLB Advanced Media, LP*, 2020 WL 1957450, at *4 (S.D.N.Y. Apr. 23, 2020) (citing *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)). If the court determines that the arbitration clause is narrow, a collateral matter is generally viewed as outside the scope of the arbitration clause; and if the clause is broad, the court applies a rebuttable presumption of arbitrability that reaches even those collateral matters. *Id.*

---

of proposed redactions). The Court considering the proposed redacted pleading directed Lavvan not to redact that information. *See* Cyrulnik Decl., Ex. B.

Whether an arbitration clause is broad or narrow turns on whether the clause applies to all claims and controversies (resulting in a broad reading) or if the clause is limited to specific issues (resulting in a narrow reading). *Id.* One "sign that an arbitration clause is narrow" is "language in another portion of the agreement that fixes rules for judicial treatment other than arbitration." *Ji Dong Cheng v. HSBC Bank USA, N.A.*, 2020 WL 3165214, at *3 (E.D.N.Y. June 15, 2020).

While the RCL Agreement commits most disputes to arbitration, Section 7.2.1 expressly excludes all IP disputes from arbitration. That provision states in its entirety:

> In the event that a dispute arises with respect to the scope, ownership, validity, enforceability, revocation or infringement of any Intellectual Property, and such dispute cannot be resolved by the management of both Parties in accordance with Section 3.2.4, unless otherwise agreed by the Parties in writing, ***such dispute will not be submitted to arbitration and either Party may initiate litigation solely in a court or other tribunal of competent jurisdiction*** in the country of issuance, registration, application or other protection, as applicable, of the item of Intellectual Property that is the subject of the dispute.

Compl. Ex. A at 30 (emphasis added). Section 7.2.1 is clear: IP disputes "*will not be submitted to arbitration.*" This effectively narrows the arbitration clause in Section 7.1.1 to non-IP claims.

The Court must next determine if the claims at issue are within the purview of the arbitration clause as narrowed. Lavvan's claims are plainly IP claims concerning Amyris's infringement of Lavvan's trade secrets and patent rights. As such, they fall squarely within the prohibition on arbitration under Section 7.2.1.

Remarkably, Amyris fails to address the mandatory terms of Section 7.2.1 and controlling law, instead arguing (at 9–12) that because the Complaint in this action contains allegations that overlap ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

Citing no law, Amyris goes even further, suggesting (at 9–10) that ████████████████ ████████████████████████████ somehow demonstrate a lack of good faith. Amyris further

erroneously contends (at 10) that Lavvan's claims for trade secret misappropriation and patent infringement are somehow "contract claims" and "not intellectual property disputes." These nonsensical arguments miss the mark. As described below, Lavvan has brought cognizable IP claims, which Section 7.2.1 dictates must be brought in court, not arbitration.

It is unremarkable that the facts and circumstances underlying Lavvan's IP claims overlap with its contract and tort claims. As is commonplace, Lavvan's IP rights arise under contract. *See, e.g.*, *Spin Master, Ltd. v. E. Mishan & Sons, Inc.*, 2019 WL 6681563, at *9–10 (S.D.N.Y. Dec. 9. 2019) (plaintiff asserting patent claims based on license agreement); *Genometrica Research Inc. v. Gorbovitski*, 2013 WL 394892, at *4–8 (E.D.N.Y. Jan. 31, 2013) (same). Nor is it surprising that Amyris's decision to cast its partner aside and proceed to act in blatant disregard of the parties' agreement and Lavvan's intellectual property rights gives rise to both IP claims on the one hand and contract and tort claims on the other. Indeed, the parties expressly contemplated that the RCL Agreement may give rise to IP claims, which is why they addressed the prospect of such claims in Section 7.2.1. Amyris cannot avoid the plain terms of Section 7.2.1 by wishfully recharacterizing Lavvan's IP claims as contract claims, and cites no authority that supports its attempt to recharacterize Lavvan's claims. The law is just the opposite: "It is well established that the plaintiff is the 'master of his complaint' and may characterize his causes of action as he pleases." *Hochroth v. William Penn Life Ins. Co.*, 2003 WL 22990105, at *1 (S.D.N.Y. Dec. 19, 2003).

### B.  Whether Lavvan's IP Claims Should Be Arbitrated Is a Question for this Court, Not an Arbitrator

The application of Section 7.2.1 to prohibit arbitration of Lavvan's IP claims is a question for this Court, not for an arbitrator. The "issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as

construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (internal quotation marks omitted). Absent such "clear and unmistakable" evidence, "questions of arbitrability are ordinarily for judicial determination." *Microsoft Corp. v. Samsung Elecs. Co.*, 60 F. Supp. 3d 525, 529 (S.D.N.Y. 2014). "If the contract is silent with respect to arbitration of arbitrability, or if it is ambiguous, then the Court must decide the issue itself." *Id.*

Here, the "clear and unmistakable evidence" in Section 7.2.1 shows that the question of arbitrability may *not* be submitted to the arbitrator: IP disputes "will not be submitted to arbitration." Rather, for IP disputes, the parties "may initiate litigation solely in a court or other tribunal of competent jurisdiction." Submitting such a dispute first to an arbitrator to decide arbitrability would run directly contrary to these plain terms.

Incredibly, Amyris argues (at 7) that Section 7.2.1 is somehow "totally irrelevant to this motion." That argument is groundless. *First*, Amyris mischaracterizes Section 7.2.1, contending (at 7) that Section 7.2.1 "permits intellectual property disputes to be litigated." In fact, Section 7.2.1 does not simply "permit" litigation in the courts—it *prohibits arbitration* absent both parties' written consent and *requires* the parties to assert those claims in court. *Next*, Amyris argues (at 9) that the parties' adoption of the ICC rules in Section 7.1.1—a separate provision governing non-IP disputes—somehow provides clear and unmistakable evidence of an intent to arbitrate questions of arbitrability even for IP disputes. Amyris is wrong.

Amyris relies (at 7–9) on inapposite cases for the proposition that a contractual reference to the ICC rules is evidence of the parties' agreement to "let the arbitrator decide questions of arbitrability," but Amyris's cited cases involve arbitration clauses that fundamentally differ from the relevant provisions of the RCL Agreement. *See Shaw Grp.*, 322 F.3d at 121 (arbitration

clause provided that "all disputes" would be arbitrated, "qualified only by the requirement that the matter must be one 'concerning or arising under the Representation Agreement'"); *VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322, 326 (2d Cir. 2013) (quoting *Shaw Group* and involving agreement with similar terms); *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208–10 (2d Cir. 2005) (contract provided for arbitration of "any controversy arising with respect to this Agreement," with no qualification or carve-out).

By contrast, as noted, the RCL Agreement contains a separate provision, Section 7.2.1, categorically identifying an entire class of claims that "will not be submitted to arbitration." In addition to affirmatively setting forth the dispute-resolution process for IP claims, Section 7.2.1 has the effect of narrowing the scope of Section 7.1.1 to non-IP disputes. *Cf. Microsoft*, 60 F. Supp. 3d at 529 (arbitration clause that limits arbitration to "specific types of disputes" is "narrow").  Where "the arbitration clause is a narrow one," the inference that adoption of the ICC rules constitutes clear and unmistakable evidence of the parties intent to arbitrate arbitrability "does not hold." *Id.*[4]

Moreover, Section 7.2.1 addressing IP claims does not contain any reference to the ICC rules, and so the RCL Agreement's reference to the ICC rules in Section 7.1.1 addressing non-IP claims does not provide "clear and unmistakable evidence" of who should decide whether disputes arise under Section 7.1.1 or Section 7.2.1. To the contrary, when an agreement "carves out certain issues from arbitration," that carveout "delays application" of the arbitral rules "until a decision is made as to whether a question does or does not fall within the intended scope of

---

[4] The RCL Agreement's lack of "clear and unmistakable" evidence of the parties' intent to arbitrate arbitrability is underscored by the contract's forum selection clause, which states that disputes "shall be submitted *exclusively* to any state or Federal court located in New York County, New York, without restricting any rights of appeal." RCLA § 16 (emphasis added).

arbitration, in short, until arbitrability is decided." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014) (affirming that question of arbitrability belong to court, not arbitrator). Thus, where parties determine that some disputes are to be arbitrated and others are not permitted to arbitrated, a reference to the ICC rules in the arbitration clause does not "clearly and unmistakably" establish that questions of arbitrability are for the arbitrator to decide. *Id.* at 1031–32. Without such clear and unmistakable evidence to the contrary, the default rule of judicial determination of questions of arbitrability controls. *Id.* at 1032.

## II.    Lavvan States Proper Patent Infringement and Trade Secret Claims Against Amyris

In the alternative to its meritless motion to compel arbitration, Amyris argues (at 12–20) that Lavvan's claims should be dismissed under Rule 12(b)(6) for failure to state a claim. Amyris's fallback arguments for dismissal all fall flat. On a motion to dismiss, the court "must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff "to determine if the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Horzion Comics Prods., Inc. v. Marvel Entm't, LLC*, 246 F. Supp. 3d 937, 940 (S.D.N.Y. 2017) (internal quotation marks omitted). Lavvan's patent and trade secret claims readily meet this standard.

### A.  Lavvan States a Claim for Amyris's Patent Infringement

Lavvan adequately alleges Amyris's patent infringement. To determine whether a patent infringement pleading is sufficient under Rule 12(b)(6), "the Court must apply Second Circuit law." *Anchor Sales & Mktg. v. Richloom Fabrics Grp.*, 2016 WL 4224069, at *3 (S.D.N.Y. Aug. 9, 2016). Allegations that a product infringes a patent "by virtue of certain specific characteristics" satisfy the pleading standard. *Iron Gate Sec., Inc. v. Lowe's Cos.*, 2016 WL 1070853, at *3 (S.D.N.Y. Mar. 16, 2016). The plaintiff "is not required to list which of the

claims in the patent have been infringed in its pleading." *Id.* Indeed, the plaintiff "need not even identify which claims are being infringed." *Id.* (quoting *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1334–35 (Fed. Cir. 2012)); *see also, e.g.*, *Regeneron Pharms. v. Merus B.V.*, 2014 WL 2795461, at *2–4 (S.D.N.Y. June 19, 2014) (denying motion to dismiss where plaintiff alleged, on information and belief, that defendant "made a genetically modified mouse" that infringed plaintiff's patent).

Lavvan has readily met the pleading standard, alleging that Amyris has improperly used, and continues to improperly use the "Pathway Patents," "Additional Pathway Patents," and "Fermentation Patents" (each of which is further specifically defined in detail in Paragraph 240 of the Complaint) to "develop and produce cannabinoids from yeast strains" and "through fermentation." Compl. ¶ 244. Lavvan selected Amyris as a partner and paid millions of dollars to obtain an exclusive license to Amyris's patents because those patents can be used to develop and manufacture valuable cannabinoids from yeast strains through fermentation. *Id.* ¶¶ 43–47, 61–73, 85. Amyris has publicly declared that it is developing and manufacturing such cannabinoids in that precise manner without Lavvan's consent, in blatant violation of Lavvan's exclusive licenses and thus infringing the licensed patents. *Id.* ¶¶ 206–14, 244.

Amyris attacks (at 13–15) Lavvan's well-founded allegations as "entirely conclusory" such that they supposedly "utterly fail to put Amyris on notice as to the basis of any claim of patent infringement." Amyris's position is unfounded. Lavvan has set forth ample detailed allegations to put Amyris on notice of its infringement. For example, Lavvan alleges that the patents at issue are key components of Amyris's biotechnology platform for production of "intermediate molecules" that are "critical in the biosynthetic production of cannabinoids," and that it is prohibitively difficult to develop "biosynthetic cannabinoids using yeast-based

fermentation without infringing" on such patents. Compl. ¶¶ 43–46. Lavvan further alleges that
the patents are encompassed by Lavvan's license to all Amyris IP "reasonably necessary or
actually used for the research, development, Manufacture, and Commercialization of
Cannabinoids" under the RCL Agreement, and that the licensed patents—which Lavvan
specifically identifies in the Complaint—"include claims covering the production" of Acetyl-
CoA and isoprenoid precursors, including isopentenyl pyrophosphate and geranyl pyrophosphate
(*i.e.*, intermediate molecules critical in the production of cannabinoids from yeast strains), and
"claims covering the production of isoprenoids, including cannabinoids, through fermentation."
*Id.* ¶¶ 63, 238–40, 244. Lavvan alleges that Amyris is developing cannabinoids from yeast
strains using its "biotechnology platform" and "through fermentation," as Amyris's own public
statements have confirmed. *Id.* ¶ 244. Based on these facts and Lavvan's considerable
"knowledge regarding the process by which cannabinoids are developed and manufactured,"
Lavvan alleges that Amyris is necessarily using these patents to produce cannabinoids from yeast
strains through fermentation. *Id.* ¶ 243. Indeed, Amyris likely took the very strains developed for
Lavvan under the RCL Agreement, using the licensed patents, and is availaing itself of other
opportunities to commercialize CBG and other cannabinoids without Lavvan. *See id.* ¶¶ 44–45
(Amyris lacked experience with cannabinoids prior to the RCL Agreement); *id.* ¶¶ 194, 211–13
(Amyris pursuing cannabinoid opportunities without Lavvan).

In light of these detailed and specific allegations, Amyris's citations to cases involving
"parroting"—in which the plaintiff merely quotes the language of the relevant patent claim and
says the defendant infringed on that claim—are inapt. *See N. Star Innovations, Inc. v. Micron
Tech., Inc.*, 2017 WL 5501489, at *1–2 (D. Del. Nov. 16, 2017) (plaintiff failed to plead "facts
that say *something* about" why it believes patent was infringed); *L.M. Sessler Excavating &*

*Wrecking, Inc. v. Bette & Cring, LLC*, 2017 WL 4652709, at *4 (W.D.N.Y. Oct. 17, 2017) (defendant's conduct described "solely in the words of" the patent at issue); *Macronix Int'l Co., Ltd. v. Spansion Inc.*, 4 F. Supp. 3d 797, 804–05 (E.D. Va. 2014) (complaint containing no factual allegations relating to infringement, aside from plaintiff's assertions that relevant patents were infringed by defendants' products dismissed as parroting because it "simply alleges that each element of a cited claim is infringed"). Unlike plaintiffs in those cases, Lavvan alleges a detailed course of conduct by Amyris that does not merely recite the claims in a patent: Lavvan partnered with Amyris and obtained exclusive licenses to its patents to produce biosynthetic cannabinoids using the patents at issue, and Amyris is now producing such biosynthetic cannabinoids using those patents without Lavvan's consent, in violation of Lavvan's exclusive license.

Moreover, the law does not even require the level of detail Lavvan did include. Amyris currently has a significant informational advantage over Lavvan, as Amyris "has refused to provide Lavvan with adequate information concerning which patented technology it uses to develop and manufacture cannabinoids"—even though Amyris is contractually obligated to provide that information to Lavvan, Lavvan has long requested such information, and Lavvan holds an exclusive license to the patents. Compl. ¶ 243. Amyris cannot use that informational advantage as a grounds for seeking dismissal of Lavvan's complaint. A plaintiff may plead facts upon information and belief where those facts "are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 356 (S.D.N.Y. 2014) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also, e.g.*, *Energy Intelligence Grp., Inc. v. Jefferies, LLC*, 101 F. Supp. 3d 332, 339

13

(S.D.N.Y. 2015) (copyright infringement claim plausibly alleged with respect to hundreds of works where plaintiff knew some works were infringed but could not identify "whether any individual work was infringed" because the defendant was "in sole possession" of such information); *Prowire LLC v. Apple, Inc.*, 2017 WL 3444689, at *6 (D. Del. Aug. 9, 2017) (denying motion to dismiss patent infringement claim pleaded on information and belief where information was in defendant's "sole control").

Further, a defendant "should not be heard to complain that the plaintiff has pleaded a claim on information and belief, when the defendant has refused to allow the plaintiff to obtain information that could demonstrate whether the claim has a solid factual basis." *Corning Inc. v. Shenzhen Xinhao Photoelectric Tech. Co.*, --- F. Supp. 3d ---, 2020 WL 4690285, at *7 (W.D.N.Y. Aug. 13, 2020) (rejecting defendant's argument that complaint failed to show that the defendant "*necessarily* used" the relevant technology—at pleading stage, plaintiff is not required to "eliminate all other possible explanations," especially where defendant "thwarted" plaintiff's "efforts to obtain more information"); *see also McRO, Inc. v. Namco Bandai Games Am., Inc.*, 23 F. Supp. 3d 1113, 1121 (C.D. Cal. 2013) (rejecting defendant's "attempt to escape liability" on the grounds that plaintiff did not know at pleading stage "exactly where the allegedly infringing conduct occurred").

Amyris's informational advantage discredits its claim (at 15) that it somehow is not "on notice as to the basis of any claim of patent infringement." Amyris is on clear notice that the infringed patents are those it licensed exclusively to Lavvan and is improperly using to develop and manufacture biosynthetic cannabinoids without Lavvan and in violation of Lavvan's exclusive license. *See, e.g.*, *Regeneron*, 2014 WL 2795461, at *4 (notice was adequate where

plaintiff "alleged a specific patent and a specific product that allegedly infringes that patent by virtue of certain specific characteristics").

Finally, Amyris incorrectly suggests (at 15) that the Complaint is insufficient because Lavvan does not set out the claims of infringed patents. Amyris's argument misstates the pleading standard. *See Iron Gate*, 2016 WL 1070853, at *3 (plaintiff "is not required to list which of the claims in the patent have been infringed in its pleading" and "need not even identify which claims are being infringed"). Indeed, Amyris's invented pleading standard would run contrary to applicable Local Rules: "Requiring this level of specificity at the pleading stage would render this district's Local Patent Rule 6, requiring the submission of claim charts within 45 days after the initial Scheduling Conference, superfluous." *Id.* at *3 n.27. Amyris relies solely on two out-of-Circuit cases that are not only non-binding but also irrelevant. *See Grecia v. McDonald's Corp.*, 724 F. App'x 942, 945–47 (Fed. Cir. 2018) (explaining that "regional circuit" law governs the pleading standard, applying Seventh Circuit law, and holding that, in the narrow circumstance where "the accused infringer does not appear to possess any element" of a system patent, a plaintiff may still state a claim for infringement by plausibly alleging that the defendant "benefits from each element of the claimed system"); *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1328–29 (Fed. Cir. 2017) (deciding post-trial motion for judgment as a matter of law, not motion to dismiss).[5]

---

[5] The issue addressed in *Grecia*—"what is considered 'use' of a claimed system when the accused infringer must act to put the claimed system into service, but the accused infringer does not appear to possess any element of the claimed system"—is so narrow that it was, in 2018, a matter of first impression for the Federal Circuit. *See* 724 F. App'x at 945–46 (referring to "gap in our jurisprudence"). It is thus unsurprising that *Grecia* is scarcely cited, and never by a court in this Circuit.

### B. Lavvan States a Claim for Amyris's Misappropriation of Trade Secrets

Lavvan adequately alleges Amyris's acts of trade secret misappropriation under the Defend Trade Secrets Act (DTSA). To state a claim, Lavvan must allege that (i) it possessed a trade secret which (ii) Amyris misappropriated. 28 U.S.C. § 1836(b)(1). Lavvan alleges both elements.

Lavvan and Amyris each developed trade secrets in pursuit of their cutting-edge, technical goal of producing biosynthetic cannabinoids. Lavvan developed trade secrets based on its business insights, industry and product expertise, and analyses. *See* Compl. ¶¶ 105–09, 143–46. Amyris developed technical trade secrets and licensed them exclusively to Lavvan under the RCL Agreement. *Id.* ¶¶ 215–20. When Amyris abandoned the partnership and decided to develop biosynthetic cannabinoids without Lavvan, it misused and misappropriated those trade secrets, which belong exclusively to Lavvan (in the case of the business trade secrets because Lavvan owned them, and in the case of the technical trade secrets because Lavvan holds an exclusive license to them). In the face of Lavvan's well-pleaded allegations, Amyris invents a novel but unfounded theory that the mere existence of the RCL Agreement forecloses trade secrets claims in deference to contract claims. Amyris is wrong.

### (i) Lavvan Alleges the Existence of Protectable Trade Secrets

Lavvan alleges protectable trade secrets under the DTSA. Six factors generally bear on the existence of a protectable trade secret:

(1) The extent to which the information is known outside the business

(2) The extent to which it is known by employees and others within the business

(3) The measures taken to guard the information's secrecy

(4) The value of the information to the business and its competitors

(5) The effort or money expended in developing the information

(6) The ease or difficulty for others to acquire or duplicate the information

*Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020). "These factors are guideposts, not elements, and it is not necessary to plead every single factor to state a claim." *Id.* Certain business insights are commonly and uncontroversially considered trade secrets. *Id.* (customer lists); *Medidata Sols., Inc., v. Veeva Sys. Inc.*, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) (marketing and business plans).

      The business trade secrets Lavvan developed are of the type that are commonly considered protectable and meet all of these factors. Lavvan identified the opportunity to develop biosynthetic cannabinoids and brought "experience in the cannabis and cannabinoid field," including "highly sought-after" executives and scientists. Compl. ¶¶ 87, 89, 105. Using its unique experience, Lavvan "collected, reviewed, and synthesized" relevant reports and findings, and also conducted an exhaustive search and analysis of commercial manufacturers. *Id.* ¶¶ 106, 142, 145. In the course of those efforts, Lavvan developed various trade secrets, including (i) regulatory and business analysis to identify "the best products and best markets to target for commercialization," including to identify early the then–"relatively unknown" CBG cannabinoid to target first-to-market commercialization; and (ii) "information about the selection process and criteria" for engaging a commercial manufacturer, including "the factors that make a manufacturer a good partner for the specific cannabinoid opportunities" at issue, such as "methods through which a particular manufacturer could control allergens." *Id.* ¶¶ 106–07, 143–45, 207. These insights enable faster time to market and greater market share. *Id.* ¶¶ 40, 41. They are incredibly valuable for a company dedicated to pursuing biosynthetic cannabinoid production. Their value is demonstrated, in part, by Amyris's decision to abandon its partnership with Lavvan, independently develop CBG, and herald CBG in its press release as "the 'stem cell'

of cannabinoids"—the precise terminology Lavvan's CEO has routinely used in describing CBG to Amyris. *Id.* ¶¶ 207, 212.

Because Lavvan's trade secrets were valuable, Lavvan took steps to protect to them, including to restrain Amyris from making costly public disclosures, by amending the RCL Agreement to impose economic penalties for such unauthorized public announcements. *Id.* ¶ 117. Indeed, only after Amyris abandoned Lavvan did Amyris improperly announce its strategic decision to target CBG and tout it as "the 'stem cell' of cannabinoids." *Id.* ¶¶ 207, 209. Lavvan took other security measures as well, including restricting employee access to key files, executing non-disclosure agreements, and using secure technologies such as encryption. *Id.* ¶¶ 202–05.

The trade secrets over which Lavvan acquired an exclusive license from Amyris are similarly protectable. Lavvan explains how each such trade secret functions and its value. *See, e.g.*, *id.* ¶ 216(b) (explaining how trade secret increases "the speed to market"). As with its patent claims, Lavvan expects the contours and use of these licensed trade secrets to be developed more fully in discovery. *Id.* ¶ 217. Though Amyris exclusively licensed its trade secrets to Lavvan under the RCL Agreement, it has not fulfilled its obligations to adequately disclose them to Lavvan. *Id.* ¶¶ 180, 208.

Amyris ignores the Complaint's detailed allegations with respect to the trade secrets, including those cited above, and erroneously contends (at 17) that Lavvan "fails to describe *any*" of the trade-secret factors. Amyris's wishful characterization bears no resemblance to what Lavvan has actually alleged, and certainly does not view Lavvan's allegations "in the light most favorable to" Lavvan as required on a motion to dismiss. *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 508 (S.D.N.Y. 2015).

For example, Lavvan's allegations make clear that Lavvan expended effort and funds to develop its trade secrets, as Lavvan "collected, reviewed, and synthesized" reports, which it "maintained and regularly updated," and conducted an exhaustive search for a commercial manufacturer. Compl. ¶¶ 106, 142, 145. These allegations well exceed the requisite level of detail needed to show effort and funds expended. *See Iacovacci*, 437 F. Supp. 3d at 381 (sufficient to allege that litigant "expended considerable resources, both financial and in personnel time, developing this non-public information"); *ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *1 (S.D.N.Y. July 10, 2019) (sufficient to allege that plaintiff has spent "significant amounts of time and money in developing, improving, and protecting" its trade secrets).

Likewise, far from merely pleading that Lavvan "took security very seriously," Lavvan describes concrete steps it took to secure its trade secrets, including the kinds of contractual and technical protections that courts regularly find satisfy the pleading standard. *See Medidata*, 2018 WL 6173349, at *3 (sufficient to allege restricted employee access, nondisclosure agreements, and policies against unauthorized transfers); *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (sufficient to allege restricted employee access and nondisclosure agreements).

Further, it is well-recognized that "relatively general descriptions of alleged secrets" are permissible at the motion to dismiss stage. *Ad Lightning Inc. v. Clean.io, Inc.*, 2020 WL 4570047, at *2 (S.D.N.Y. Aug. 7, 2020) (Oetken, J.) (quoting *Island Intellectual Prop., LLC v. StoneCastle Asset Mgmt. LLC*, 2020 WL 2793000, at *7 (S.D.N.Y. May 29, 2020)); *see also Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 n.5 (S.D.N.Y. May 12, 2020) (plaintiff "need only identify 'the general contours' of the trade secrets to plead a viable claim of

misappropriation"). Even "categories of information" may suffice. *Medidata*, 2018 WL 6173349, at *1 (sufficient to plead broad categories of "sales and marketing activities," and "short- and long-term business plans"). As long as the complaint puts the defendant on notice, more precise identification can be left to discovery. *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, 2019 WL 5694256, at *17 (E.D.N.Y. July 22, 2019) ("the level of specificity increases as the case and discovery proceeds").

Lavvan's complaint exceeds this standard, alleging specific categories of trade secrets with illustrative examples. Lavvan's allegations thus stand in stark contrast to the pleadings in the cases Amyris cites (at 16–18) involving mere "conclusory allegations" of trade secrets. *See Island Intellectual Prop.*, 2020 WL 2793000, at *7 (alleging only that "certain proprietary, secret and confidential information relating to cash management and money regulation systems and, in particular, to the implementation of the inventions set forth in the asserted patents"); *Principia Partners LLC v. Swap Fin. Grp.*, 2019 WL 4688711, at *3 (S.D.N.Y. Sept. 26, 2019) (merely alleging failure to return "proprietary information," "documents," and "confidential information"); *Lawrence v. NYC Med. Practice, P.C.*, 2019 WL 4194576, at *5 (S.D.N.Y. Sept. 3, 2019) (merely alleging "trade secrets with respect to patient coordination," "signing up patients," and "advertising and other techniques" with "scant facts" about any "reasonable steps" to protect secrecy). Lavvan's allegations contain significantly more detail than the threadbare recitals in the cases on which Amyris misguidedly relies.

### (ii) Lavvan Alleges Misappropriation by Amyris

Lavvan also alleges that Amyris misappropriated trade secrets under the DTSA. Specifically, Amyris improperly misappropriated the trade secrets without authorization by using them to develop biosynthetic cannabinoids without Lavvan, in violation of the parties'

partnership under the RCL Agreement. Trade secret misappropriation is commonly intertwined with this kind of blatant breach of contract. *See* David Q. Quinto et al., *Trade Secrets: Law and Practice* § 2.05[2][a][i] (2019) ("Contracts are often implicated in the protection of trade secrets").

Amyris suggests (at 19) that its misappropriation of trade secrets is "purely a contractual dispute," not a trade-secret dispute. Amyris is wrong. It is commonplace for trade-secret claims to arise out of facts that also involve a breached contractual relationship, as when an employee with otherwise lawful access to trade secrets improperly provides those trade secrets to a competitor. *See, e.g.*, *AUA Private Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (complaint alleged DTSA misappropriation where defendant allegedly "uploaded" trade secrets from her work laptop to her personal cloud-based storage without plaintiff's permission and "in direct violation of the confidentiality agreements that she signed"). In such cases, the viability of a breach-of-contract claim does not preclude an independent trade-secret misappropriation claim. *See Trahan v. Lazar*, 457 F. Supp. 3d 323, 340, 344 (S.D.N.Y. 2020) (permitting DTSA claim alongside breach of contract claim where trade secrets had been given to defendant who then improperly used them). Amyris's own cited case law directly rejects Amyris's theory, finding "no support for such a rule" that a DTSA claim should be dismissed as "duplicative of the breach of contract claim." *Principia Partners*, 2019 WL 4688711, at *4 n.4; *see also ExpertConnect*, 2019 WL 3004161, at *8 (dismissing good-faith-and-fair-dealing claim as duplicative of breach-of-contract claim, but *not* dismissing DTSA claim as duplicative).

Amyris focuses narrowly on its *acquisition* of the trade secrets, ignoring its unauthorized *misuse* of those trade secrets. But misappropriation encompasses unauthorized misuse. 18 U.S.C. § 1839(5)(B)(ii) (defining misappropriation to include improper use); *Trahan*, 457 F. Supp. 3d at

344. Thus, contrary to Amyris's assertions (at 19), it is not dispositive that Lavvan, "shared its alleged trade secrets with Amyris in accordance with the RCLA". Further perpetuating this error, Amyris argues (at 19) that it cannot possibly have "improperly acquired its own trade secrets." Amyris is attacking a strawman argument. Lavvan does not contend that Amyris "improperly acquired its own trade secrets," but rather that Amyris has improperly *used* those trade secrets without authorization after licensing them exclusively to Lavvan. Compl. ¶¶ 215–20; *see also* RCLA § 8.2 (Amyris had to keep trade secrets confidential and "not use such" trade secrets "for any purpose outside the scope" of the RCL Agreement). The DTSA permits licensees, like Lavvan, to bring claims for trade secret misappropriation. *See* 18 U.S.C. §§ 1836(b)(1) ("owner" may bring claims), 1839(4) (licensee is an "owner"). By granting Lavvan an *exclusive* license to the trade secrets, Amyris had a duty to Lavvan to "maintain the secrecy" and "limit the use" of such trade secrets. *Id.* § 1839(5)(B). *Cf. Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1482 (Fed. Cir. 1998) (in contrast to non-exclusive patent licensee, exclusive licensee can sue patent owner for infringement).

## CONCLUSION

For the reasons above, Lavvan respectfully requests that the Court deny Amyris's motion in its entirety.


Dated: October 30, 2020

ROCHE CYRULNIK FREEDMAN LLP

  */s/ Jason Cyrulnik*
Jason Cyrulnik
jcyrulnik@rcfllp.com
Paul Fattaruso
pfattaruso@rcfllp.com
Richard Cipolla
rcipolla@rcfllp.com

Daniel Stone
dstone@rcfllp.com

Stephen Lagos
slagos@rcfllp.com

99 Park Avenue, 19th Floor
New York, NY 10016

*Counsel for Plaintiff, Lavvan, Inc.*